## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:22-cr-00017-DRL-MGG |
| | ) | |
| | ) | |
| SHAQUILLE DELANEY, | ) | |
| | ) | |
| Defendant | ) | |
| _____ | ) | |

## <u>DEFENDANT'S SENTENCING MEMORANDUM</u>

Comes now the defendant, Shaquille Delaney, by and through his counsel Donald J. Schmid, to submit this sentencing memorandum in preparation for the January 12, 2023 sentencing hearing in this case.

### Disposition of the Case

Mr. Shaquille Delaney was indicted in three counts on March 9, 2022.  (DE 20.)  Mr. Delaney was arrested on February 16, 2022 on an overbroad criminal complaint.  (PSR, p. 1.)  He was detained pending disposition of his case.  (DE 19.)  Mr. Schmid made his appearance as counsel on February 18, 2022.  (DE 6.)

A written plea agreement was signed and then was filed on August 30, 2022.  (DE 54.)  Then, on September 13, 2022, the defendant formally entered his guilty plea to a single count of the indictment, Count 2.  That count charged distribution of 50 grams or more of methamphetamine on August 18, 2021:

1

**THE GRAND JURY FURTHER CHARGES:**

## COUNT 2

On or about August 18, 2021, in the Northern District of Indiana,

**SHAQUILLE DELANEY,**

defendant herein, knowingly and intentionally distributed 50 grams or more

of methamphetamine, a Schedule II controlled substance.

All in violation of Title 21, United States Code, Sections 841(a)(1) and

(b)(1)(A)(viii).

(DE 20 p. 2, and DE 58.)

The factual basis in the plea agreement described the defendant's offense of

conviction here.

> On or about August 18, 2021, in the Northern District
> of Indiana, I knowingly and intentionally distributed
> 50 grams or more of methamphetamine, a schedule II
> controlled substance, in violation of Title 21, U.S.C. §
> 841(a)(1) and (b)(1)(A)(viii). Specifically, I delivered to
> another individual methamphetamine in excess of one
> hundred grams in exchange for United States
> currency.

(DE 54, at p. 7.)

At no time in its criminal complaint, indictment or the plea agreement did the

government ever mention "actual methamphetamine" or pure methamphetamine.  (DE 1,

20, and 54.)

Under the terms of the plea agreement, the defendant is free to recommend any sentence to this Court. The government is obligated under the plea agreement to recommend a three-level reduction for acceptance of responsibility and also to recommend a sentence no higher than the low-end of the applicable guideline range. (DE 54, pp. 5-6.)

## Objections to the Presentence Report

The defendant's objections are listed out in the Addendum to the Presentence Report. (DE 64.)

The defendant objects to the use of the actual methamphetamine guidelines in this case because these guidelines lack an empirical basis, because the severity of the actual methamphetamine offense levels is not justified by empirical data, because the Guidelines' distinction between actual methamphetamine and a mixture of meth is arbitrary[1] – even irrational, and because the actual methamphetamine guidelines are otherwise seriously flawed. The specifics and legal authorities underlying this objection are contained in **Attachment 1** to this Sentencing Memorandum. Again, it should also be noted that neither the Indictment nor the factual basis set out in the plea agreement (drafted by government counsel) made any reference to "actual methamphetamine." Rather, these documents regarding the offense of conviction referenced only "methamphetamine." (DE 20 p. 2, and DE 54, at p. 7.)

The defendant also objects to a firearm enhancement under U.S.S.G. § 2D1.1(b)(1). The defendant did not actually possess any firearm during the three drug distributions that constitute the offense of conviction and the relevant conduct in this case. The government

---

[1]    The arbitrariness of the methamphetamine/actual methamphetamine distinction is demonstrated specifically in *this* case by the fact that, because some of the meth in this case was tested and some was not tested. (See PSR ¶ 24.) As a result, the Probation Officer who wrote the presentence report was forced to use converted drug weight to deal with the two "different" controlled substances. (Id.)

3

has not presented a scintilla of evidence that the defendant possessed any firearm during the controlled buys on August 5 and 18, 2021 or January 20, 2022.

The .22 rifle referenced in the PSR was found during a search of 1036 W. Oak Street during a search on January 26, 2022 -- six days *after* the last January 20, 2022 distribution listed as relevant conduct in this case. The defendant's offense was completed by the time the firearm was first located by police. The enhancement is not applicable. See *United States v. Durrive*, 902 F.2d 1221, 1232 (7th Cir. 1990) (the government must show that "the weapon was possessed during the offense" for the§ 2D1.1(b)(1) to be applied).

Moreover, the type of firearm recovered is relevant. *United States v. Edmonds*, 9 F. App'x 330, 332 (6th Cir. 2001): *United States v. Greeno*, 679 F.3d 510, 515 (6th Cir. 2012) (the type of firearm involved relevant to 2D1.1(b)(1)); *United States v. Millan-Miranda*, 796 F. App'x 115, 116 (3d Cir. 2020) (same). Here, the firearm recovered was a .22 rifle:

5) Mossberg .22 Rifle    Ser: EM13902100

(Govt. discovery bates no. 60-61, search warrant return dated January 28, 2022.)

It was clearly improbable that this .22 rifle was connected with the offense of conviction in Mr. Delaney's case. See U.S.S.G. § 2D1.1(b)(1), application note 11(A). *United States v. North*, 900 F.2d 131, 135 (8th Cir. 1990) (.410 shotgun and .22 rifle "warrants a finding that it is clearly improbable the guns were connected with the offense"). Among other things, this rifle was not easily concealable to be useful during a drug trafficking sale. The rifle also lacked the firepower to be useful to someone involved in illegal drug trafficking.

Most important, the government has no evidence that the defendant ever possessed a firearm including the .22 rifle during any of the three drug distributions that constitute the offense of conviction (August 18, 2021 at Leer/Randolph in South Bend, Indiana) or relevant conduct (August 5, 2021 at 330 N. Dixie Way in South Bend, Indiana and January 20, 2022) in this case.

### Applicable Guideline Range/Statutory Mandatory Minimum

The defendant's adjusted offense level on the drug distribution charge, as currently calculated in the PSR, is 31.  The defendant believes that his adjusted offense level should be 23, calculated as follows:

- For at least 200 G but less than 350 G of Methamphetamine (specifically 316.8 g methamphetamine) - Level 26, pursuant to § 2D1.1(c)(7).

- Then reduced by three levels for acceptance of responsibility, pursuant to § 3E1.1

With a criminal history category of VI, the defendant's guideline range on his offense of conviction, before considering the applicable mandatory minimum, is 92 -115 months imprisonment.   There is a mandatory minimum sentence here of ten years imprisonment. Thus, the defendant believes that his final adjusted guideline range is 120 months imprisonment.

The defendant recommends to the Court and asks for a sentence of 120 months imprisonment, for the reasons set forth in this memorandum.

### Parsimony Principle

Perhaps the most fundamental prescription of the sentencing statutes is that the Court is to "impose a sentence sufficient, but not greater than necessary, to comply" with the sentencing statutes.  18 U.S.C. § 3553(a).  See also *United States v. Torres-Gomez*, No. 11-CR-237, 2012 U.S. Dist. LEXIS 57082, at *3-4 (E.D. Wis. Apr. 24,

2012) ("parsimony provision" serves as the "overarching command of the statute"). This rule of parsimony applies in all federal sentencings. *United States v. Dupriest*, 794 F.3d 881, 885 n.4 (7th Cir. 2015). As the Seventh Circuit noted, "The parsimony principle in § 3553(a) is an important and binding instruction from Congress." *United States v. King*, 861 F.3d 692, 696 (7th Cir. 2017).

The Supreme Court instructed in *Gall v. United States* that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." 552 U.S. 38, 49, 128 S. Ct. 586, 169 L. Ed. 2d 445 (2007); reconfirmed in *Peugh v. United States*, 133 S. Ct. 2072, 2080, 186 L. Ed. 2d 84 (2013). Once the district court has done so, however, it is not permitted to "presume that the Guidelines range is reasonable. ... [It] must make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50.

The Seventh Circuit has explained that not only may a district court "not presume that a guideline sentence is the correct one," *Nelson v. United States*, 555 U.S. 350, 352, 129 S. Ct. 890, 892 (2009); *Rita v. United States*, 551 U.S. 338, 351, 127 S. Ct. 2456, 168 L. Ed. 2d 203 (2007), but the district court cannot "even place a 'thumb on the scale favoring a guideline sentence.'" *United States v. Pennington*, 667 F.3d 953, 958 (7th Cir. 2012) (quoting *United States v. Sachsenmaier*, 491 F.3d 680, 685 (7th Cir. 2007)).

In the instant case, a sentence of 10 years imprisonment for the defendant's participation in the distribution of a total of 316.8 grams of methamphetamine (including relevant conduct) would be sufficient, but not greater than necessary, to comply with the sentencing statutes. See *United States v. Bullington*, No. 02:10-CR-20057-002, 2011 U.S. Dist. LEXIS 79178, at *8 (W.D. Ark. July 20, 2011). No more than this is necessary to serve the statutory goals of just punishment, deterrence, respect for the law, and the other aspirations of the sentencing statute. Ten years imprisonment is a substantial and lengthy

prison sentence – especially for a 32-year-old man who has serious mental health and substance abuse issues and who suffered a traumatizing childhood. Any more than 120 months would be inconsistent with the fundamental parsimony provision that is paramount in the federal sentencing statutes and would be more than is necessary here to serve the statutory goals outlined in the sentencing statutes.

## This Court's Sentencing Discretion

Deviation from guideline sentences on policy and other grounds is permitted. *Spears v. United States*, 555 U.S. 261, 129 (2009). Such discretion may be exercised not only based on characteristics that distinguish a case from the "heartland" of cases contemplated by the guidelines, but also based on general policy considerations that apply "even in a mine-run case." *Kimbrough v. United States*, 552 U.S. 85, 109 (2007). See also *United States v. Bannister*, 786 F. Supp. 2d 617, 662-63 (E.D.N.Y. 2011); *United States v. Newhouse*, 919 F. Supp. 2d 955, 965 (N.D. Iowa 2013).

A growing consensus is emerging that federal prison sentences are too long, particularly in drug trafficking cases brought against persons of color. Former Supreme Court Justice Anthony Kennedy observed: "Our punishments [are] too severe, our sentences [are] too long." Anthony M. Kennedy, Assoc. Justice, Supreme Court of the United States, Speech at the American Bar Association Annual Meeting, (Aug. 9, 2003), https://www.supremecourt.gov/publicinfo/speeches/viewspeech/sp_08-09-03 (quoted in Towards The Second Founding Of Federal Sentencing, 77 Md. L. Rev. 485, 498 (2018)). "There is a growing understanding that harsh sanctions might not always be the proper response to law breaking, as they impose excessive costs on society, and their effectiveness is unclear." Day Fines: Reviving The Idea And Reversing The (Costly) Punitive Trend, 55 Am. Crim. L. Rev. 333, 334-335 (2018).

Many have questioned the long sentences meted out in federal courts for drug trafficking crimes. As one judge aptly noted, "A meaningful regime of retribution requires a sober-minded assessment of proportionality and moral responsibility. The imposition of lengthy prison sentences for drug offenses, particularly for nonviolent offenses committed by street vendors, often defies a fair sense of retribution. Violent offenders must be punished appropriately for their crimes. Such crimes as murder, rape, or armed robbery warrant harsh sentences. The same treatment may not be warranted for the consensual sale of a product, even a highly destructive one, to knowing, willing, adult purchasers in retail quantities." *United States v. Bannister*, 786 F. Supp. 2d 617, 669 (E.D.N.Y. 2011). Mr. Delaney is a non-violent offender who distributed a modest quantity of methamphetamine. He would be considered at worst a "street dealer."

Beyond the destruction of personal lives, families, and neighborhoods caused by excessively long prison sentences for low-level drug trafficking crimes, courts have noted the racial disparity of long sentences imprisonment imposed on African-American persons. "Excessive incarceration has disproportionately affected African Americans." *Bannister*, 786 F. Supp. 2d at 651. This has had an adverse impact on African-American communities and on African-American families – most particularly on the children in African-American families.

The defendant asks this Court to sentence him at the statutory minimum in recognition that sentences in the United States for drug trafficking offenses have been too harsh and too long for too long a period.

### Mr. Delaney's Criminal History

Mr. Delaney is in criminal history category VI – per the guidelines. His most recent prior conviction was for possession of marijuana. (PSR ¶ 61.) Marijuana use and possession is being decriminalized increasingly in the United States. As part of this recent

decriminalization trend, President Biden on October 6, 2022 issued a presidential proclamation that pardoned all persons with federal convictions for simple marijuana possession offenses.    Presidential Proclamation on Marijuana Possession (justice.gov) https://www.justice.gov/pardon/presidential-proclamation-marijuana-possession    A Proclamation on Granting Pardon for the Offense of Simple Possession of Marijuana | The White House    https://www.whitehouse.gov/briefing-room/presidential-actions/2022/10/06/granting-pardon-for-the-offense-of-simple-possession-of-marijuana/

### Mr. Delaney's Personal Characteristics
### including mental health issues

Mr. Delaney is a United States citizen.  Mr. Delaney suffered a traumatic childhood, with a history of family dysfunction.  The defendant was placed in foster care with his siblings and had 24 case managers over seven years as a child.  The defendant's time with his father was positive but he remained in foster care for long periods of time until his 18th birthday.  (PSR ¶ 92.)  To say that Mr. Delaney suffered a troubled and traumatic childhood is an understatement.  His criminal history should be understood in this context.

The letter dated January 2, 2023 from Pamela J. Giudice who has known Mr. Delaney for many years is insightful in this regard.  Ms. Giudice observed first-hand the trauma that Mr. Delaney suffered as a child, and the difficulties he experienced being handed off from one case manager to another.  She has also seen and can testify to the real growth that Mr. Delaney has shown recently.  She knows of his intelligence and his repentance for wrong choices he made in the past.  She believes in him and asks this Court for lenience.  (Her letter is **Attachment 2** to this Sentencing Memorandum.)

Your undersigned as well as seen the growth and maturity in the defendant since his arrest in this case.

*Mental Health*

The defendant has long suffered from depression.   It is also believed that Mr. Delaney suffers from PTSD.  (See PSR ¶ 100, and P. Giudice letter, Attachment 2, p. 2.)

*Substance abuse*

Mr. Delaney scored a nine on the TCU drug screen administered as part of the presentence investigation in this case, and he has a long history of abuse of several substances.  Given the trauma of the defendant's childhood, his substance abuse is not surprising.

Participation in the RDAP program would assist his rehabilitation.

### Selection of Sentence

Mr. Delaney has been incarcerated in this case since February 16, 2022.  (PSR, p. 1.) There is no overwhelming reason to keep Mr. Delaney imprisoned beyond 120 months in this case, considering the defendant's age, his mental health illness and sufferings, and the lengthy period of supervised release that can be imposed here in addition to a term of imprisonment.

Mr. Delaney is 32 years of age.  With a ten-year sentence of imprisonment here and a supervised release period following his term of imprisonment, Mr. Delaney will be in his 40s when his federal sentence is completed.  Researchers, judges, and courts have noted how persons "age out" of criminal activity.  See generally "Settling Down and Aging Out: Toward an Interactionist Theory of Desistance and the Transition to Adulthood," found at http://users.soc.umn.edu/~uggen/Massoglia_Uggen_AJS_10.pdf ("we find a tight linkage between desistance" from crime and age advancement).  See also *United States v. Carmona-Rodriguez*, 2005 WL 840464, *5 (S.D.N.Y. 2005) (observing that those defendants "over the age of 40 . . . exhibit markedly lower rates of recidivism in comparison to younger defendants).

The National Institute of Justice notes that age is a powerful factor in deterring crime and that criminals naturally age out of crime.  Office of Justice Programs, National Institute of Justice, Five Things About Deterrence, United States Department of Justice (May 2016), https://nij.gov/five-things/pages/deterrence.aspx (citing Robert J. Sampson, John H. Laub, and E.P. Eggleston, On the Robustness and Validity of Groups, 20 Journal of Quantitative Criminology 1, 37-42 (2004)).  The Sentencing Commission's research shows that the older the age of the offender, the lower his or her recidivism rate (24.7% re-arrest rate for individuals age 51-60 years).  *See* U.S.S.C., Recidivism Among Federal Offenders: A Comprehensive Overview, Parts II & IV (March 2016), http://www.ussc.gov/research/research-reports/recidivism-among-federal-offenders-comprehensive-overview   See also *United States v. Walker*, 252 F. Supp. 3d 1269, 1295 (D. Utah 2017).

As noted above, the most fundamental prescription of the sentencing statutes is that the Court is to "impose a sentence sufficient, but not greater than necessary, to comply" with the sentencing statutes.  18 U.S. Code § 3553(a).  District judges are not to rotely or mechanically impose guideline sentences.  *Gall v. United States*, 552 U.S. 38, 50 (2007) (district judges "may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts presented").

Federal district courts have routinely concluded that the applicable mandatory minimums are sufficient to punish a drug trafficking offender, especially a non-violent one.  As one court concluded and observed: "A sentence of 120 months is a substantial amount of time to spend in prison and is sufficiently severe to promote respect for the law.  This sentence is also sufficiently lengthy to deter others—assuming lengthy sentences actually deter drug use or drug selling—which is contrary to my experience."  *United States v.*

*Newhouse*, 919 F. Supp. 2d 955, 991 (N.D. Iowa 2013) (where the calculated USSG range was 262 to 327 months).

Here, in this case, it should again be emphasized that the drug trafficking here did not involve any kind of violence or any actual use of a firearm by Mr. Delaney.  (See PSR ¶¶ 9-16.)

One of the factors that the court is to consider in sentencing a defendant is deterrence.   18 U.S.C. § 3553(a)(2)(B).  One might think that a very long sentence would have a great deterrent effect.  "Empirical evidence, however, indicates that general deterrence is effectuated more by certainty, i.e., detection rate, and celerity, i.e., the quickness of detection, and less by the severity of punishment if caught."  *United States v. Valdez,* 77 F. Supp. 3d 1115, 1152 n.17 (D.N.M. 2014).  "It appears to be primarily in the certainty of punishment, not its severity, that deterrent power lies."  *United States v. Bannister,* 786 F. Supp. 2d 617, 660 (E.D.N.Y. 2011) (citing Steven N. Durlauf & Daniel S. Negin, Imprisonment and Crime: Can Both be Reduced?, 10 Criminology & Pub. Pol'y 13, 37 (2011)).

In this specific case, there is little reason to believe that a sentence of more than ten years imprisonment would have a significantly greater deterrent effect than an imposed sentence of ten years imprisonment (with a period of supervised release).   Deterrence will be adequately achieved with a sentence of ten years imprisonment here and five years of supervised release for Mr. Delaney.

## Conclusion

A sentence of 120 months imprisonment followed by five years supervised release for Mr. Delaney in this case would be reasonable and just (indeed, the defense believes that a sentence of less than 120 months would be reasonable and just).  There can be little doubt that a ten-year sentence of imprisonment would "reflect the seriousness of the offense, …

promote respect for the law, and … provide just punishment for the offense."  18 U.S.C.
§ 3553(a)(2)(A).  Such a substantial sentence would adequately punish Mr. Delaney.
Respectfully, the defendant asks this Court to impose this sentence for all the reasons set
out in this memorandum.  See *United States v. Bullington*, No. 02:10-CR-20057-002, 2011
U.S. Dist. LEXIS 79178, at *8 (W.D. Ark. July 20, 2011) (non-guidelines sentence
appropriate given defendant's drug distribution was low-level and "the defendant is in
relatively poor health").

Finally, Mr. Delaney would request a recommendation from this Court to the U.S.
Bureau of Prisons to assign him to FCI Milan Michigan.  He would benefit from the RDAP
program too, and seeks a judicial recommendation for that as well.

Dated: January 3, 2022

Respectfully submitted,

/s/  *Donald J. Schmid*
_____

Donald J. Schmid
Attorney for Defendant Shaquille Delaney

Law Offices of Donald J. Schmid LLC
1251 N. Eddy St., Suite 200
South Bend, IN 46617
schmid@donaldschmidlaw.com
phone: 574-993-2280

**Attachment 1**

(details of the defendant's objection to actual methamphetamine calculation)

DE 61 – Defendant's Objections to PSR dated

---

# MEMORANDUM

---

**TO:**        USPO MOLLY BAKER

**FROM:**      DONALD J. SCHMID

**SUBJECT:**   DEFENDANT'S OBJECTIONS TO PSR

**DATE:**      DECEMBER 9, 2022

**CC:**        AUSA KIM SCHULTZ

---

The defendant submits the following defendant's objections to the first draft of the PSR.

**Objection to page 2:**

The defendant does not believe that his license is suspended.

**Objection to paragraph 1:**

Here a three count Indictment was filed, not two counts.

**Objection to paragraph 9:**

The defendant does not have a phone number of 408-798-9944.


**Objections to paragraphs 25, 30, 39, and 116:**

The defendant objects to the use of the actual methamphetamine guidelines in this case because these guidelines lack an empirical basis, because the severity of the actual methamphetamine offense levels is not justified by empirical data, because the Guidelines' distinction between actual methamphetamine and a mixture of meth is arbitrary – even irrational, and because the actual methamphetamine guidelines are otherwise seriously flawed.

The sentencing court may "reject and vary categorically from the [drug] Guidelines based on a policy disagreement with those Guidelines."  *Spears v. United States*, 555 U.S. 261, 265-66 (2009); accord *Kimbrough v. United States*, 552 U.S. 85, 107 (2007).  See also *United States v. Corner*, 598 F.3d 411, 415 (7th Cir. 2010) ("We

1

understand *Kimbrough* and *Spears* to mean that district judges are at liberty to reject any Guideline on policy grounds …").

The United States Sentencing Guidelines Manual (Nov. 1, 2018) and current 2021 manual set a 10 to 1 ratio between actual methamphetamine and methamphetamine mixture. This ratio rests on the faulty premise that defendants who traffic in pure methamphetamine play a more significant role in the drug hierarchy and are, therefore, more culpable than defendants who traffic in a mixture. But because nearly all the methamphetamine currently sold in the Unites States is pure,[1] purity provides a poor proxy for culpability and role. See, e.g., *United States v. Rodriguez*, 382 F.Supp.3d 892, 896-97, n.31 (D. Alaska 2019) (citing *United States v. Austin*, No. 1:18-CR-023, 2018 WL 4087987 (D. Idaho Aug. 27, 2018) ("Purity is also a less meaningful proxy for culpability where nearly all methamphetamine sold is of 90 percent purity or greater"). Yet the sentencing guidelines as currently written apply substantially higher penalties in all cases involving pure methamphetamine, which exposes small-scale, street-level dealers to punishments intended for major drug traffickers and kingpins. As explained in more detail below, the purity distinction leads to arbitrary sentencing outcomes and contributes to unwarranted sentencing disparity. Because the actual methamphetamine guidelines fail to assess culpability rationally and appropriately, this Court should categorically reject them and instead apply the guidelines for methamphetamine mixture in this case.

I.    **Because they are not based on empirical data or expert analysis, this Court should reject the actual methamphetamine guidelines on policy grounds.**

In determining a sentence that is sufficient, but not greater than necessary, district courts may "not presume that the guideline range is reasonable." *Gall v. United States*, 522 U.S. 38, 49-50 (2007). Rather, sentencing courts must consider whether a guideline sentence is improper either because "the Guidelines reflect an unsound judgment," or otherwise fail to properly reflect the purposes of sentencing set forth in 18 U.S.C. § 3553(a). *Rita v. United States*, 551 U.S. 338, 357 (2007). As noted earlier, district courts can categorically vary from the guideline-established range solely on a disagreement with the policy underlying a guideline. *Spears v. United States*, 555 U.S. 261, 264 (2009). A sentencing court's decision to vary from the Guidelines is especially sound where the guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role." *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (finding it was not an abuse of discretion to conclude "that the crack/powder disparity yields a sentence "greater than necessary" to achieve § 3553(a)'s purposes, even in a mine-run case."). In other words, where the Commission failed to base its guideline determinations "on empirical data and national experience" to achieve a sentencing

---

[1]    Drug Enforcement Administration, *2020 National Drug Threat Assessment*, 21. See also DEA, *2018 National Drug Threat Assessment*, 62 (Oct. 2018)

range that roughly achieves the purposes of sentencing set forth in 18 U.S.C. § 3553(a), a "court's decision to vary . . . may attract greatest respect." *Id.* This is especially so "when the sentencing judge finds a particular case 'outside the "heartland" to which the Commission intend[ed] individual Guidelines to apply.'" *Id.* (quoting *Rita*, 551 U.S. at 351).

The Sentencing Commission did not base the drug guidelines "on empirical data and national experience" as called for by its "characteristic institutional role." As a result, the drug guidelines yield a piecemeal set of rules that have been subjected to decades of mostly upward ratcheting, unrelated to any attempt to achieve sentencing ranges that roughly satisfy the § 3553(a) factors. The excessively severe sentences called for by the actual methamphetamine guidelines do not, therefore, represent the "heartland" to which the Sentencing Guidelines were intended to apply.

### A.     The drug guidelines lack an empirical basis.

In developing other guidelines, the Commission utilized pre-guidelines sentencing data as a "starting point" and "analyzed data drawn from 10,000 presentence investigations . . . the United States Parole Commission's guidelines and statistics, and data from other relevant sources" to establish average sentence length and "accepted, modified, or rationalized" these averages to create offense levels. USSG §1A1.3; USSC, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* 72-73 (2004); *Rita*, 551 U.S. at 349. In accordance with its statutory directive, the Commission is to amend "the Guidelines thereafter by studying federal court decisions and seeking advice from prosecutors, law enforcement personnel, defense counsel, civil liberties associations, and experts[,]" to achieve "a set of Guidelines that seek to embody the § 3553(a) considerations, both in principle and practice." *United States v. Hayes*, 948 F. Supp. 2d 1009, 1019 (N.D. Iowa 2013) (quoting *Rita*, 551 U.S. at 349).

But in establishing the drug guidelines, the Commission departed from this "characteristic institutional role" as envisioned by 28 U.S.C. § 994, and has continued to reject an empirical approach in favor of pegging offense levels to statutory minimum terms. *Gall*, 552 U.S. at 46 n.2 (citing USSG §1A1.1 (Nov. 2006)); *Kimbrough*, 552 U.S. at 109. "[E]mpirical data on drug trafficking offenses were gathered, but they had no role in the formulation of the Guidelines ranges for drug trafficking offenses." *United States v. Diaz*, No. 11-CR-00821-2, 2013 WL 322243 *4 (E.D.N.Y. Jan. 28, 2013). Nor has the Commission since engaged in any "study of court decisions" or reasoned analysis to restructure the quantity-driven drug guidelines in any significant way.[2]

---

[2]     It should also be noted that, since early 2019, the U.S. Sentencing Commission has been without the quorum of four voting members required by statute to promulgate amendments to the sentencing guidelines, policy statements, and commentary. Thus, no changes or amendments to the U.S. Sentencing Guidelines have been made since November

3

Instead of developing drug guidelines based on empirical data, the Commission linked USSG § 2D1.1 base offense levels to the same drug quantity thresholds that triggered the mandatory minimum penalties codified in the Anti-Drug Abuse Act of 1986 (ADAA). *Gall*, 552 U.S. at 46 n.2 (citing U.S.S.G. §1A1.1 (2006); and Ronnie Skotkin, *The Development of the Federal Sentencing Guidelines for Drug Trafficking Offenses*, 26 Crim. Law Bull. 50, 52 (1990). Opting to key the drug guidelines to statutory thresholds, the Commission produced a patchwork set of guidelines based solely on politics. Indeed, the origins of the mandatory minimum thresholds specified in the ADAA have been a matter of speculation. Courts have surmised based on the available legislative history that the quantity-driven thresholds were intended to reflect relative culpability and more severely punish large-scale drug traffickers.[3] But as applied, the quantity-driven guidelines have instead subjected the average street-level drug dealer to the severe punishments that Congress originally intended only for drug kingpins and leaders of large-scale drug trafficking enterprises. See *Diaz*, 2013 WL 322243 at *6.

## B. The actual methamphetamine guidelines lack an empirical basis.

While the drug guidelines as a whole fail to reflect the Commission's "characteristic institutional role," the guidelines for actual methamphetamine are particularly problematic and capricious. No empirical basis supports the current quantity thresholds nor does it support the Commission's increasingly harsh treatment of actual methamphetamine over time.

### 1. History of the actual methamphetamine guidelines

When the Commission first issued the sentencing guidelines, it treated methamphetamine less severe than heroin but two times more severely than cocaine. USSC, *Methamphetamine Final Report* 7 (1999) (hereinafter Methamphetamine Report) ("1

---

1, 2018. (*See* October 28, 2021 email from Charles R. Breyer, Acting Chair, U.S. Sentencing Commission.)

[3]     See *Chambers v. United States*, 500 U.S. 453, 465 (1991) (citing legislative history in concluding that the ADAA "is intended to punish severely large-volume drug traffickers at any level."); and *Hayes*, 948 F. Supp. 2d at 1020 (citing USSC, *Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System* at 24 (2011) ("the two-tiered penalty structure of the ADAA was intended to punish 'discrete categories of drug traffickers,' such as drug kingpins and organizers."); and USSC, *Special Report to Congress: Cocaine and Federal Sentencing Policy* at 119 (1995) (quoting floor debate on the ADAA, "For the kingpins—the masterminds who are really running these operations—and they can be identified by the amount of drugs with which they are involved—we require a jail term upon conviction, the minimum term is 10 years . . . . Our proposal would also provide mandatory minimum penalties to the middle-level dealers as well. Those criminals would also have to serve time in jail. The minimum sentences would be slightly less than those for the kingpins, but they nevertheless would have to go to jail—a minimum of 5 years for the first offense.")

gram of methamphetamine = 2 grams of cocaine = .4 gram of heroin = 400 grams marihuana"). The ADAA did not prescribe mandatory minimum penalties for methamphetamine offenses and did not distinguish between actual methamphetamine and a mixture. *See* Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207 (1986). Instead, Congress and the Commission treated methamphetamine the same as any other Schedule II substance. *See id.*; and USSG §2D1.1 (1987). However, in 1988, when Congress established mandatory minimum sentences for methamphetamine offenses and distinguished between pure and a mixture of methamphetamine, the Commission followed suit. The Commission increased the quantity thresholds to link offense levels and quantity to Congress's statutory minimums.[4] These increases "ascribed to methamphetamine [mixture] a potency approximately 2.5 times that of the former law," but amplified pure (actual) methamphetamine 20 times over previous thresholds.[5] The new statutory thresholds, and the base offense levels that mimic them, were chosen without regard to empirical data or research. They are seemingly random selections intended to penalize "kingpins" in a drug hierarchy with a 10-year minimum term upon their first conviction and "middle-level dealers" with a 5-year minimum for their first offense. *Hayes*, 948 F. Supp. 2d at 1020 *supra* n. *13.

In 1998 Congress increased methamphetamine penalties again. *Methamphetamine Report* at 12 (citing the Methamphetamine Trafficking Penalty Enhancement Act of 1998, Pub. L. No. 105-277, Division E, 112 Stat. 2681 (1998)). This time, Congress reduced by half the quantities that trigger the five and ten-year statutory minimums, equalizing the methamphetamine thresholds with crack-cocaine quantities at the time. S.2024, 105th Cong., 2d Sess. (1998) (Sponsor's title of the bill: "To increase the penalties for trafficking in methamphetamine in order to equalize those penalties with the penalties for trafficking in crack cocaine."). Although the Commission recognized it was not required to amend the guidelines,[6] it concluded that "un-linking the Drug Quantity Table from the mandatory minimum quantities established by Congress in a manner that reduces sentences would vary from past practice of the Commission and may prove *politically unwise*."[7] As a result, the Commission again increased the Guidelines to match the statutory minimums. Not once since amending the Guidelines to conform

---

[4]    *Methamphetamine Report* at 8 ("[O]ffense level 26 corresponded to the minimum quantities triggering the five-year mandatory minimum: 10 grams of [pure] methamphetamine or 100 grams of methamphetamine mixture; and level 32 corresponded to the minimum quantities triggering the ten-year mandatory minimum: 100 grams of [pure] methamphetamine or 1 kilogram of methamphetamine mixture.").

[5]    *Id*. at 8; and USSG §2D1.1(c) (1989) (100 grams of pure methamphetamine = 5 kilograms of cocaine = 1 kilogram of heroin = 1,000 kilograms of marihuana).

[6]    *Methamphetamine Report* at 18.

[7]    *Id*. (emphasis added).

with statutory minimums has the Commission engaged in any "study of court decisions" or "reasoned analysis" of the methamphetamine quantity thresholds to determine whether the penalties promote the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

In 2010, Congress revisited and reduced the statutory thresholds for crack cocaine in order to remedy excessive and unjust sentences. The Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372 (2010). The Commission followed suit and amended the Guidelines Manual. USSC, Amend. 706 (Nov. 1, 2011). But no such reconsideration was undertaken for actual methamphetamine. And despite the large amount of evidence available in support of revising the actual methamphetamine guideline, the Commission has failed to study its shortcomings. "No other drug is punished more severely based on purity." *Hayes*, 948 F.Supp.2d at 1025 (citing Amy Baron-Evans, *Deconstructing the Meth Guidelines, Presentation for the Sentencing Resource Counsel, Federal Public and Community Defenders* at 12). The Guidelines treat 50 grams of actual methamphetamine the same as 280 grams of crack cocaine, 5 kilograms of powder cocaine, 1 kilogram of heroin, and 1,000 kilograms of marijuana. USSG §2D1.1(c)(5).[8] These thresholds and their corresponding punishments do not make sense in light of the available data.

## 2.    The severity of the actual methamphetamine offense levels is not justified by empirical data.

The available data fail to support the Commission's severe treatment of methamphetamine, particularly in relation to other drugs. The Drug Enforcement Agency (DEA) reports that 667,000 Americans age 12 or older used methamphetamine in 2016. 2018 Drug Assessment at 62. If frequency of use is an indicator of relative harm, there were significantly more users of heroin and cocaine during the same period: 948,000 users reported heroin use, and 1.9 million used powder and crack cocaine. *Id.* at 17 (2018 Drug Assessment). Nor can health risks justify the offense levels. In 2015, 128,884 treatment admissions to publicly funded facilities were reported as methamphetamine-related and, in 2016, 7,542 deaths attributed to "psychostimulants," which include methamphetamine. Comparatively, 401,743 heroin users sought admission for treatment in 2015, and in 2016 there were 15,469 heroin-related overdose deaths. *Id.* at 15 (2018 Drug Assessment). While only 74,710 cocaine users sought treatment admissions in 2015, there were 10,375 deaths involving cocaine the following year. *Id.* at 46 (2018 Drug Assessment). Despite that both heroin and

---

[8]    A drug trafficking defendant carrying 50 grams of a substance would be punished very differently based on the type of drug: A guideline range of 15 to 21 months would apply for trafficking in 50 grams of powder cocaine, 51 to 63 months would apply for 50 grams of crack cocaine, and 27 to 33 months would apply for 50 grams of heroin, while a range of 97 to 121 months applies for 50 grams of actual methamphetamine. (Assuming a Criminal History Category of I).

cocaine cause more drug-induced deaths than methamphetamine in a given year, and that there are far more users of heroin and cocaine than there are for methamphetamine, the guideline still recommends that actual methamphetamine cases be punished approximately 5 times more severely than crack cocaine; 100 times more severe than powder cocaine; and 20 times more severe than heroin. *See* USSG §2D1.1(c)(5) (the Guidelines Manual assigns a base offense level of 30 to cases involving 50 grams of actual methamphetamine, 280 grams of crack cocaine, 5 kilograms of powder cocaine, and 1 kilogram of heroin.). There is no reasoned explanation for these disparities.

## II.    Because of shifts in the methamphetamine drug market, the Guidelines' distinction between actual methamphetamine and mixture is arbitrary – even irrational.

In establishing the distinction between pure methamphetamine and a mixture, both Congress and the Sentencing Commission assumed that drug purity "is probative of the defendant's role or position in the chain of distribution." USSG §2D1.1, comment (n. 27(C)) ("The purity of the controlled substance . . . may be relevant in the sentencing process because it is probative of the defendant's role or position in the chain of distribution. Since controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs."); see also *Hayes*, 948 F.Supp.2d at 1020 (discussing the legislative record for the ADAA). For this reason, the guidelines establish a 10 to 1 ratio for actual methamphetamine versus a mixture containing a detectable amount of methamphetamine, penalizing those offenders that possess actual methamphetamine ten times as severe as those dealing in a mixture.[9] Methamphetamine with a tested purity of 80% or less constitutes a "mixture," and all purities above 80% are considered "actual," or pure, methamphetamine. See USSG §2D1.1, notes to drug quantity table (n.C). In cases where the seized methamphetamine was not tested for purity, a presumption applies that treats the substance as having been 10 percent pure.[10]

But because today nearly all methamphetamine on the market is pure methamphetamine, the Commission's actual/mixture distinction is irratioal. See *United States v. Hubel*, 625 F.Supp.2d 845, 853 (D. Neb. 2008) ("The Guidelines' quantity-driven, "market-oriented" approach is not a proxy for culpability in every case, nor does it always correlate to the purposes of sentencing under 18 U.S.C. § 3553(a)). Drug

---

[9]    See Methamphetamine Report at 8 (discussing the 10 to 1 quantity ratio between the five and ten year minimums.).

[10]    Based on the 10 to 1 ratio between actual methamphetamine and a methamphetamine mixture, and the deference to the mixture guideline in cases in which purity testing is not available. See *Rodriguez*, 382 F.Supp.3d at 896 n.25 (citing *United States v. Dunn,* No. 1:18-CR-62, 2018 WL 5809944 (D. Idaho 2018)); *United States v. Hartle*, No. 4:16-CR-233, 2017 WL 2608221 *2 (D. Idaho June 15, 2017).

quantity is only an accurate measure when it corresponds to a defendant's position in the typical hierarchy that characterizes most drug conspiracies"); and *United States v. Hendricks*, 307 F.Supp.2d 1104, 1105 (D. Idaho 2018) ("Due to increases in the average purity of methamphetamine sold today, purity is no longer an accurate indicator of a defendant's culpability or role in a drug enterprise, and the presumptive purity assigned to untested drugs does not reflect market realities").

### A. Shifts in the methamphetamine market

While there the Commission's tiered treatment of actual/mixture methamphetamine offenses may have once been at one time been rational,[11] "[r]ealities on the ground have since changed."[12]  In 1999, the Commission indicated that average methamphetamine purity rates nationwide fell between 30 to approximately 50 percent.[13]  While still not supporting the current guidelines' 10 to 1 ratio for actual methamphetamine offenses and demonstrating the irrationality of the 10 percent presumption for untested substances, the thresholds were arguably closer to market realities.

Since 2002, methamphetamine seized in the U.S. has been increasingly pure. "Between 2002 and 2005 . . . the average purity [of methamphetamine] increased from 49 percent to 69 percent."  *Rodriguez*, 382 F.Supp.3d at 896 (citing J.C. Maxwell and B.A. Rutkowski, *The Prevalence of Methamphetamine and Amphetamine Abuse in North America: A Review of Indicators*, 1992-2008 229-235, Drug and Alcohol Rev. 27 (May 2008)).  "This number has continued to rise: across North America, after a brief period of decline between 2005 and 2008, the purity of methamphetamine continue[d] to increase steadily . . . reaching about 93 percent in 2012."  *Id.* (citing C. Chomchai and S. Chomchai, *Global Patterns of Methamphetamine Use*, Curr. Opin. Psychiatry 28(4): 269-74 (July 2015), available at www.ncbi.nlm.nih.gov/pubmed/26001916) (internal quotation marks omitted). Between 2011 and 2016, average purity increased further; DEA data show an average purity of 85.5 percent in 2011, which rose to 95 percent by 2014.  *United States v. Nawanna*, 321 F.Supp.3d 943, 951-52 (N.D. Iowa 2018) (citing DEA, 2017 National Drug Threat Assessment 70 (Oct. 2017) (hereinafter 2017 Drug Assessment)).  Purity rates have consistently exceeded 95 percent since 2013; by the second half of 2017, the average purity of methamphetamine sampled was 96.9 percent.  DEA, 2018 National

---

[11]    "[P]urity levels of seized drugs in the 10 [percent] range were common until approximately 20 years ago." United States v. Hoover, No. 4:17-CR-327, 2018 WL 5924500 *2 (D. Idaho Nov. 13, 2018) (drawing from personal experience on the bench).

[12]    *Id.*

[13]    *Methamphetamine Report* at 15 n.41 ("The White House Office of National Drug Control Policy (ONDCP) currently describes the purity of street-level methamphetamine at approximately 50 percent or more. They note that this level of purity has been consistent over the past four years. More recent DEA information suggests that purity levels have recently dropped to nearer [sic] 30 percent.") (internal citation omitted).

Drug Assessment at 60.  And while purities have continued to be in excess of 95% (*see* Appendix 1, attached hereto), average prices of the drug have plummeted to all-time lows.  DEA, 2018 National Drug Assessment at 60-61 (price per gram remained steady around $81-$70 between 2012 and 2017); DEA, 2013 National Level STRIDE Price and Purity Data 4 fig. 2 (Sept. 2015) (prices consistently fell from a high of $293 per gram during the third quarter of 2007, to $70 per gram in 2013).

The cause for this seismic shift in the methamphetamine market is clear.  In 2005, both the United States and Mexico enacted legislation to make it increasingly difficult to obtain precursor chemicals for methamphetamine production, namely pseudoephedrine.[14]  Thereafter, domestic clandestine methamphetamine laboratory seizures in the United States hit a 15-year low, with most of the methamphetamine on the market being produced in Mexico and smuggled across the Southwestern Border.[15] Mexican laboratories continue to produce low-cost, high-purity methamphetamine by seeking alternative methods of manufacture or sourcing precursor chemicals from China.[16]  Mexican drug organizations and cartels have, quite literally, monopolized the methamphetamine market in the United States.[17]

Because Mexican methamphetamine remains remarkably cheap and consistently pure, American dealers no longer risk the dangers and detection from purchasing prohibited precursor chemicals or producing the drug themselves.[18]  Mexican producers have completely taken over the methamphetamine market and, to circumvent Mexican restrictions, producers continue to adapt to alternative methods of manufacture that use precursor chemicals other than pseudoephedrine.[19]

The available evidence is clear: up to 97 percent of the methamphetamine found in the United States comes from Mexican laboratories, and this methamphetamine is

---

[14]    DEA 2018 National Drug Assessment at 65 (discussing The Combat Methamphetamine Epidemic Act of 2005).

[15]    DEA 2020 National Drug Assessment at 19: "Most of the methamphetamine available in the United States is clandestinely produced in Mexico and smuggled across the SWB."

[16]    DEA 2018 National Drug Assessment at 65.

[17]    DEA 2020 National Drug Assessment at 19; DEA 2017 National Drug Assessment at 73.

[18]    DEA 2017 National Drug Assessment at 73.

[19]    *Id*. at 67-68, 73.  At one point, Mexican producers settled on using the reductive animation method and the precursor Phenyl-2-propanone, which was found in 97 percent of samples tested by the DEA Methamphetamine Profiling Program. In 2014, a different method that uses benzaldehyde and nitroethane as precursor chemicals predominated the market. In response to Mexican regulations of these chemicals in 2015 that raised the black market cost, tested samples created by this method decreased since 2017 from 71 to 54 percent.

pure.[20]  If now in the United States all methamphetamine is pure methamphetamine, then the sentencing distinction between actual methamphetamine and a mixture is an arbitrary one.  Indeed, it is not rational any longer.

### B.    Poor proxy for culpability and role.

The distinction between actual methamphetamine and a mixture was intended to punish offenders based on relative culpability and role in a drug trafficking offense. The distinction seemed logical: the further the drug goes down the supply chain, the more the drugs is mixed, or "cut" with other substances before it reaches the street level dealers.  USSG, §2D1.1, comment n. 27.  But this is not true of methamphetamine today. Because all methamphetamine sold in the United States is now pure methamphetamine derived from and manufactured in Mexico, street-level dealers are receiving punishments otherwise reserved for kingpins and major drug traffickers.

Recent sentencing data supports this conclusion.  The U.S. Sentencing Commission reports that, in fiscal year 2018, the average sentence length for methamphetamine offenders was 95 months, while crack cocaine sentences averaged 78 months, powder cocaine 73 months, with heroin sentences at 69 months.  USSC, 2018 Sourcebook of Federal Sentencing Statistics 130 tbl. D-3 (2018) (hereinafter 2018 Sourcebook).  For a seemingly inexplicable reason, while rates of methamphetamine users, overdose deaths, and treatment admissions remain lower than that of other drugs, the amount of federally prosecuted cases involving methamphetamine have skyrocketed above all those of all other drugs in the last decade.  2018 Sourcebook at 131 tbl. D-4 (Depicting number of drug trafficking offenders by major drug type over time, fiscal years 2009-2018; number of federal cases involving methamphetamine have increased from approximately 4,000 in 2009 to over 7,000 in 2018, while all other federal drug cases have fallen below 4,000 per year.).  A logical hypothesis for this unbalanced result is that more low-level dealers are being prosecuted federally for methamphetamine offenses than for any other drug type—perhaps because federal penalties remain so disproportionately high, and charging decisions rely on prosecutorial discretion that may be motivated by ambition to secure lengthy prison sentences.  "Perhaps reflective of this reality," the Commission "reports that during fiscal year 2018, only 28.9 [percent] of methamphetamine drug trafficking offenders received 'Within Guideline Range" sentences, fewer than any other major drug category."  *United States v. Moreno*, No. 5:19-CR-002, 2019 WL 3557889 *3 n.5 (W.D. Va. Aug. 5, 2019) (citing 2018 Sourcebook 129 tbl. D-14).  At the same time, 41.7 percent of methamphetamine offenders received downward departures from the guideline range, government sponsored and otherwise, far more than are granted in cases involving any other drug.  2018 Sourcebook, at 131 tbl. D-14 (Cumulative downward departures for

---

[20]    *See id.* at 67 (identifying 97 percent of tested samples as containing the P2P precursor chemical that utilized the Mexican-developed reductive animation method).

powder cocaine were 30.4 percent, crack cocaine at 21.6 percent, and heroin departures at 29.1 percent.).  These data indicate that, on average, sentencing courts and government attorneys nationwide are recognizing a defendant's inflated sentencing accountability far more frequently in methamphetamine cases than for cases involving other major drugs.  It is time to put a stop to this systemic over-representation of the role and culpability of methamphetamine offenders based solely on purity.

An increasing number of district courts across the country have recognized the inequity of the methamphetamine purity distinction and established a categorical policy disagreement with their application in every case.  See *United States v. Ruiz*, No. 1:21-cr-148-BLW, 2021 U.S. Dist. LEXIS 198517, at *9 (D. Idaho Oct. 13, 2021); *Moreno*, 2019 WL 3557889; *Rodriguez*, 382 F.Supp.3d 892; *United States v. Pereda*, No. 18-CR-228, 2019 WL 463027 (D. Colo. Feb. 6, 2019); *United States v. Bean*, 371 F.Supp.3d 46 (D. N.H. 2019); *United States v. Nawanna*, 321 F. Supp. 3d 943 (N.D. Iowa 2018); *United States v. Saldana*, No. 1:17-CR-271, 2018 U.S. Dist. Lexis 110790 (W.D. Mich. July 3, 2018); *Hendricks*, 307 F.Supp.3d 1104; *United States v. Goodman*, 556 F.Supp.2d 1002 (D. Neb. 2008); *United States v. Orebaugh*, No. 1:21-cr-00012-BLW, 2021 U.S. Dist. LEXIS 198518, at *10 (D. Idaho Oct. 13, 2021).  See also *United States v. Carrillo*, 440 F. Supp. 3d 1148, 1157 (E.D. Cal. 2020) ("the court declares a policy disagreement with the methamphetamine Guidelines").  Still other federal courts have issued individualized opinions that announce their policy disagreement and opt instead to apply the methamphetamine mixture guidelines.  See *United States v. Johnson*, 379 F.Supp.3d 1213 (M.D. Ala. 2019); *United States v. Ferguson*, No. 17-CR-204, 2018 WL 3682509 (D. Minn. 2018); *United States v. Ibarra-Sandoval*, 265 F.Supp.3d 1249 (D. N.M. 2017); *Nawanna*, 321 F. Supp. 3d 943, 956 (N.D. Iowa 2018).  Thus, inter-district and intra-district disparity exists among similarly situated defendants based solely on geographic location and/or which judge received the case assignment.  Defendants possessing actual methamphetamine in at least these eleven districts clearly receive more lenient treatment as a matter of course than similarly situated defendants in other districts.  See *United States v. Ruiz*, No. 1:21-cr-148-BLW, 2021 U.S. Dist. LEXIS 198517, at *9 (D. Idaho Oct. 13, 2021) ("among the § 3553(a) factors most relevant here are 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct' and 'the need for the sentence imposed . . . to reflect the seriousness of the offense.' 18 U.S.C. § 3553(a)(2), (6).  For the reasons stated above, I believe that the methamphetamine Guidelines produce advisory sentences that fail to achieve these § 3553(a) objectives").

This disparity is exacerbated by arbitrarily sporadic purity testing.  The practical effect of the purity distinction results in a presumed purity of 80 percent or lower for untested methamphetamine.  Some courts have concluded the presumed purity is 10 percent, given the 10 to 1 ratio between actual methamphetamine and a mixture. *Rodriguez*, 382 F.Supp.3d at 896 n.25 (citing *United States v. Dunn*, No. 1:18-CR-62, 2018 WL 5809944 (D. Idaho 2018)); *Hartle*, 2017 WL 2608221 at *2.  This presumption results

in a significantly lower sentencing outcome for those defendants who were not subject to testing, "which is a decision that can be entirely arbitrary."

> For example:
>
> In many cases, only some of the drugs were seized and available for testing. In others, the testing lab was too busy to complete testing before sentencing. In some, the wise defendant pled guilty early in the case so that sentencing would occur before testing could be completed. In many cases, the prosecution originated with a state agency where testing could not be completed in a timely manner.

*Hartle*, 2017 WL 2608221 at *3.

"It is indisputable that a lab technician's work-speed should not determine the number of years a person spends in prison." *Pereda*, 2019 WL 463027 at *5. Judge Burgess noted specific circumstances that support the arbitrariness of testing in his district:

> . . . . in Alaska, testing for purity is almost always performed and reported for sentencings where the case started under the jurisdiction of a federal law enforcement agency. However, for cases referred by a state or local law enforcement agency, testing for purity—and whether the results of that testing are subsequently reported for sentencing purposes—occurs in only approximately half of such cases. Moreover, there are cases where the results of lab testing were not ready at the time of sentencing—or were not reported at all for sentencing purposes . . . in three separate identified sentencings, the presentence report noted that a lab report detailing the purity level of the methamphetamine was not received by the time of the issuance of a final presentence report, and that the recommendations and analysis was therefore based on the lower Guidelines range."

*Rodriguez*, 382 F.Supp.3d at 897 (emphasis added).

In *Rodriguez*, the government argued it was inappropriate to vary downward because some defendants may have received a windfall for untested drugs, but the sentencing judge reasoned that the testing decision, and therefore the supposed windfall, "depends almost entirely on the discretion . . . or the ability of the" government actors to conduct testing in a particular case. *Id.* at 897 n.33. Thus, the enhancement for actual methamphetamine becomes arbitrary when testing requirements are "not uniformly applied across all similarly situated defendants." *Id.*

Because nearly all methamphetamine is pure (actual) methamphetamine, "defendants will nearly always be subject to a substantially higher Guidelines penalty

range" when the substance is tested for purity. *Id.* See also *United States v. Ruiz*, No. 1:21-cr-148-BLW, 2021 U.S. Dist. LEXIS 198517, at *8 (D. Idaho Oct. 13, 2021) ("Purity is also a less meaningful proxy for culpability where nearly all methamphetamine sold is of 90 percent purity or greater"). When the substance is not tested, whether the defendant was dealing in actual methamphetamine or not, the substantially lower methamphetamine mixture guidelines benefit their sentence. "The Guidelines' quantity-based system was designed to punish bigger distributors more harshly, but that result cannot be achieved when the presumptive purity assigned under the Guidelines' scheme does not correlate to the actual purity of the drug being distributed and does not reflect the reality of the market for that drug." *United States v. Ortega*, No. 8:09-CR-400, 2010 WL 1994870 *7 (D. Neb. 2010). See also *United States v. Ruiz*, No. 1:21-cr-148-BLW, 2021 U.S. Dist. LEXIS 198517, at *8 (D. Idaho Oct. 13, 2021) ("arbitrariness of lab testing only compounds the issue"). Instead, the inexorable outcome is that low-level or mid-level street dealers whose substances were tested for purity will receive significantly longer sentences than kingpins in a drug trafficking organization who were lucky enough to evade testing.

The purity distinction for methamphetamine in the Guidelines is outdated and grossly overstates the culpability of the offender, and therefore, the seriousness of a methamphetamine offense given the realities of the current market. Rather, distinctions for methamphetamine based solely on quantity reflect a better culpability standard, given that a greater quantity alone equates to greater distribution potential and actual effects on communities. Culpability based on quantity is already accounted for in the drug guidelines. This Court should, therefore, disregard the actual methamphetamine distinction and instead apply the guidelines for a methamphetamine mixture.

When pure methamphetamine predominates the market and subjects nearly all offenders to the substantially higher actual methamphetamine guidelines, we punish those offenders more harshly under the faulty belief that purity equals greater culpability. The Guidelines do not recognize that, in today's market, pure methamphetamine offenses are a run-of-the-mill offense. Purity is not indicative of any greater role in the drug hierarchy or danger to the community, as Congress and the Commission envisioned when setting the purity-based penalty scheme. This Court should vary from the actual methamphetamine guideline and instead apply the guideline for a methamphetamine mixture. Since actual methamphetamine cases have become the norm, this is the only appropriate remedy.

In this case, if methamphetamine mixture is used instead of pure methamphetamine, the combined total drug weight yields about 15 kilograms. That corresponds to level 36. See USSG, 2D1.1(c)(4). This is what was done in *United States v. Nawanna*, 321 F. Supp. 3d 943, 956 (N.D. Iowa 2018) ("if all the methamphetamine at issue in Nawanna's case is treated as methamphetamine mixture, simple addition, rather than a conversion to marijuana equivalency, is all that is necessary... and the base

13

offense level ... is, once again, 32. U.S.S.G. § 2D1.1(c)(4)"). The Seventh Circuit has made clear that a judge may depart from drug guidelines because of a policy disagreement with those guidelines. *United States v. Etchin*, 614 F.3d 726, 740 (7th Cir. 2010) (citing *Kimbrough v. United States*, 552 U.S. 85, 128 S. Ct. 558, 169 L. Ed. 2d 481 (2007), and *Spears v. United States*, 555 U.S. 261, 129 S. Ct. 840, 172 L. Ed. 2d 596 (2009)). The Court should do so in this case.

Level 26 is the more appropriate and fairer starting base offense level given the current reality in the United States that almost all methamphetamine distributed in this country is pure methamphetamine that was originally manufactured in Mexico and brought into the United States.

**Objections to paragraphs 25, 31, 39, and 116:**

An enhancement under U.S.S.G. § 2D1.1(b)(1) should not be applied. The defendant did not actually possess any firearm during the three drug distributions that constitute offense and relevant conduct in this case. The government has not presented a scintilla of evidence that the defendant possessed any firearm during the controlled buys on August 5 and 18, 2021 or January 20, 2022.

The .22 rifle reference in the PSR was found during a search of 1036 W. Oak Street during a search on January 26, 2022 -- six days *after* the last January 20, 2022 distribution listed as relevant conduct in this case. The defendant's offense was completed by the time the firearms was first located by police. The enhancement is not applicable. See *United States v. Durrive*, 902 F.2d 1221, 1232 (7th Cir. 1990) (the government must show that "the weapon was possessed during the offense" for the§ 2D1.1(b)(1) to be applied).

Moreover, the type of firearm recovered is relevant. United States v. Edmonds, 9 F. App'x 330, 332 (6th Cir. 2001): United States v. Greeno, 679 F.3d 510, 515 (6th Cir. 2012) (the type of firearm involved relevant to 2D1.1(b)(1)); United States v. Millan-Miranda, 796 F. App'x 115, 116 (3d Cir. 2020) (same). Here, the firearm recovered was a .22 rifle:

5) Mossberg .22 Rifle   Ser: EM13902100

(Govt. discovery bates no. 60-61, search warrant return dated January 28, 2022.)

It was clearly improbable that this .22 rifle was connected with the offense of conviction in Mr. Delaney's case. See U.S.S.G. § 2D1.1(b)(1), application note 11(A). *United States v. North*, 900 F.2d 131, 135 (8th Cir. 1990) (.410 shotgun and .22 rifle "warrants a finding that it is clearly improbable the guns were connected with the

offense").  Among other things, this rifle was not easily concealable to be useful during a drug trafficking sale.  The rifle also lacked the firepower to be useful to someone involved in illegal drug trafficking.

**Attachment 2**

(Pamela J. Giudice letter dated January 2, 2023)

1-2-2023

Dear Judge Leichty,

I am writing in response to Shaquille Quentyn Delaney's Sentencing on Jan 12, 2023.

I met Shaquille here in So. Bend when he was 2 yrs. old. I was running an inner city outreach bus ministry through my church. I had been picking up children 5-12 yrs old. Then the Lord impressed me to go down to 2 yrs. old. I resisted the thought as they required more attention. I again was impressed to begin picking up 2 yr olds. I resisted again. Then came the 3RD impression and I realized God was very serious about this so I said "yes". The next week Shaquille showed up along with his 2 cousins. They were all 2.

Shaquille had signs of some serious trauma already at that young age as evidenced through his behavior. I offered to his mom to bring him into the Day Care at the church where I worked to begin working with him. He was emotionally starved as he would cling to the older children who all took turns holding him. It was a year of this before he started to show interest in playing with toys and depart from the constant clinging. He received a lot of love that was bringing healing.

To make a long story short, his biological family had some serious issues and Shaquille wound up in the welfare system in Michigan. I remained in close contact. Tragically, Shaquille was moved 22 times in 7 years in the system. This resulted in much more trauma added to what he had already experienced. This resulted in acting out, which I must say would be difficult for anyone to handle, being

uprooted that many times. I know the welfare system has many well meaning people involved but none the less it was very abusive in his case. He has never had any counsel or given any tools to resolve the resulting PTSD, pain/anger of what he had been through. Life has been quite unfair for him from the get go.

I've said all that to say this.... that I know God has His hand on Shaquille for a special purpose. He gave me a dream in which I knew he would go through a tumultuous period but then come out on the other side, changed. I absolutely believe this to be true. Shaquille is a very intelligent, gifted individual and will have much good to offer society. He is repentant and is calming down. I would like to ask the court to be as lenient as possible. Thank you.

Sincerely,

Pamela J. Giudice