UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:22-cr-00017 DRL |
| | ) | |
| SHAQUILLE DELANEY | ) | |

## **UNITED STATES' SENTENCING MEMORANDUM**

Comes now the United States of America, by its counsel, Clifford D. Johnson, United States Attorney for the Northern District of Indiana, through Kimberly L. Schultz, Assistant United States Attorney, and files the government's Sentencing Memorandum. As discussed below, the government respectfully suggests that an appropriate sentence would be a term of imprisonment at the low end of the guidelines. Based on a criminal history category VI and an offense level of 31, his guidelines are 188 to 235 months; though the defendant disagrees with the methamphetamine weight calculations. (Addendum to PSR, DE 64).

### **Nature and Circumstances of the Offense**

On August 5, 2021, the DEA, FBI GRIT and PCMEG worked together to perfect a controlled purchase of methamphetamine from Shaquille Delaney, a subject known to investigators for years. This buy was to take place at 330 N. Dixie Way in South Bend, Indiana. The source indicated that

Delaney was dealing in pounds and ounces. The source said they would routinely deal with Delaney in public places, at his address at 1117 College Street, or wherever Delaney wanted. The source picked Delaney out of a lineup and identified him by the street names "King" and "Messiah." The source was searched and equipped with audio and video recording devices. The source contacted Delaney by phone and Delaney indicated he was on his way to meet the source and was coming from Michigan City. Investigators provided the source with $1,800 in pre-recorded buy money for which the source was to receive four ounces of crystal methamphetamine.

The source went to the Dixie Way meet up location where surveillance was being conducted. That afternoon, a white Kia Soul appeared and it was occupied by the driver, Shaquille Delaney, and a female passenger. The source approached the car and got in back. Investigators heard the source say something like "16 right" and Delaney replied, "ya [sic]." Shortly thereafter, the source went inside an apartment before getting back into the car. The CS got out of the car again and Delaney left. The CS made contact with investigators as Delaney was leaving. The source reported that Delaney had just given the source about 45 grams of meth but was going to pick up two more ounces. The CS gave the 45 grams to investigators and waited for Delaney to return to Dixie Way with more drugs. Delaney did come back in

the same car. He handed the source a blue plastic glove with additional methamphetamine inside.

After Delaney finished the deal, the CS met with investigators to deliver the additional methamphetamine and debrief. The source explained that when Delaney initially met up with the source in the parking area at Dixie Way, Delaney did not have a scale. So, the source had to go inside an apartment door to weigh out the first delivery of drugs. When it was short, the CS observed Delaney contact his supplier and make arrangements to get more methamphetamine. Delaney left and returned with more drugs. He didn't have any bags and asked the source if the CS had any plastic bags. The source said no, they argued about prices, and ultimately Delaney handed the source methamphetamine inside of a blue plastic glove. The total weight of the methamphetamine for both parts of the transaction was about 98.7 grams.

On August 18, 2021, the DEA and FBI Grit made plans to use a CI to purchase approximately four ounces of methamphetamine for $1,800 from Delaney. They also planned to get a handgun from him for the price of $500. The source identified Delaney as using the street names Messiah and King. The source picked Delaney out of a photo array. Using established controlled methods, they searched the source and outfitted the person with audio and video recording devices. Police provided about $2,300 in pre-recorded buy

3

money. The source contacted Delaney at the same phone number from the previous deal and also used the Facebook messenger application to reach Delaney through username "Trufa Messiah." After a few attempts, the source reached Delaney who said he was heading to South Bend. Delaney directed the source to go to the area of Leer and Randolph in the city of South Bend. Police doing surveillance saw the source enter an alleyway in that area. Delaney was seen entering a white SUV and pulling into the same alleyway.

On the recording of the conversation in real time, police heard Delaney say, "give me the fuckin money." Delaney then directed the source to go to 1306 Brookfield to get the gun. Shortly thereafter, the source left the alley and handed police methamphetamine that came from Shaquille Delaney. The source provided four individual bags with rock-like substances within. The source explained that after the source handed Delaney $2,300, Delaney walked over to a Cadillac Escalade and got a yellow plastic bag. Delaney gave the source the yellow bag and it contained the meth. Delaney had instructed the source to go to Brookfield to get the gun from Delaney's sister. The source was instructed by police that the source should *not* go buy the gun from the Brookfield address for safety reasons; therefore, that part of the deal did not take place. The methamphetamine weighed about 117 grams including bags.

The drugs obtained from Delaney on August 18th were sent for confirmatory testing to the DEA North Central Lab. The lab test shows that

the net weight of the methamphetamine hydrochloride was 110.0 grams plus or minus 0.6 grams with a substance purity of 98% plus or minus 6%. The amount of pure substance is 108.6 grams plus or minus 6.7 grams.

On January 20, 2022, another controlled purchase took place from Delaney using a confidential source. The source was to go to a residence at 1036 Oak Street in South Bend to buy crystal methamphetamine directly from Shaquille. The source said that Delaney would charge different amounts depending on his mood and how much the source would buy. In this case, the source contacted Delaney on his Trufa Messiah Facebook account. The source was provided recorded buy money and outfitted with audio-video recording devices. The source went inside and there were other individuals present. The source saw Delaney deal controlled substances to two other individuals while the source was inside. Delaney charged this source $1,200 for the requested amount of drugs. The source left the residence and met up with investigators.

During the debrief, the source handed over a plastic bag containing suspected methamphetamine that came from Delaney. It had a weight of 114 grams with packaging. That evidence was submitted for testing, but no results have been received. The audio and video recording devices were retrieved from the source. Investigators reviewed the video. It clearly shows

Shaquille Delaney dealing methamphetamine from inside the residence on Oak Street.

The suspected meth was sent to the DEA lab for confirmatory testing. Those results were recently obtained. The substance did indeed test positive for methamphetamine hydrochloride and had a weight of 111.8 grams plus or minus 0.2 grams. The amount of pure substance was 109.5 grams and the purity was 98% plus or minus 6%.

On January 26, 2022, investigators attempted another buy from Delaney. This time, the source communicated with Delaney regarding the transaction; however, when the source went to the buy location, Delaney was not there, and a different person performed the deal.

Although they were unsuccessful in making a purchase directly from Delaney, on the same date, investigators obtained a Criminal Complaint and search warrant for the Oak Street address. When the warrant was executed, Delaney was not in the home. Instead, there were two different individuals inside. Inside the house, police found evidence of domain for Shaquille Delaney that included a utility bill in his name for the applicable address dated January 2022. There was a marijuana plant within approximately one foot of a loaded .22 caliber Mossberg rifle. Police found two cell phones, digital scales, US currency (including buy money from a prior transaction), paraphernalia, a drug ledger, synthetic marijuana, marijuana (about 140

grams), assorted pills (110 grams), a small amount of methamphetamine (weight unknown), an "amount of cocaine" and "an amount of fentanyl and heroin" (approximately 70 grams).

Police spoke to one of the individuals who had been inside the residence at the time the search warrant was executed. He indicated that Delaney goes by Trufa Messiah and they knew one another from being in jail together. This individual reported that he ran into Delaney and Shaquille offered him a place to stay. This individual said he never saw Delaney deal drugs, but he has collected money on Delaney's behalf before. He said he had seen Delaney with a firearm in the past, particularly when they were in a car together. He was unable to provide investigators with a make or model of the firearm.

On February 12, 2022, an undercover drug investigator with the South Bend Police Department traveled to the Blue Chip Casino in Michigan City enjoying some slot machines with his wife. While at that location, he happened to sit down next to Shaquille Delaney who still had an active arrest warrant based on the Criminal Complaint. The investigator notified other police agencies and Delaney was arrested on Blue Chip Drive in Michigan City. Police attempted to interview Delaney. The asked him about the rifle and marijuana plant inside the Oak Street address. Delaney said he never touched the rifle. He said he does sleep in the living room at that address. He said he had never been inside the Oak Street address when drug dealing was

happening. He said he did not deal crystal methamphetamine to anyone in South Bend in January or February 2022. He said he is a user of methamphetamine and stated he would use a gram or two at a time. He also said he ingests meth by eating it.

A Facebook search warrant was obtained, and responsive records were returned to investigators for the Trufa Messiah Facebook account that Delaney used during various instances in this investigation. Inv. Paul Strabavy reviewed the records and saw numerous instances of drug dealing within the messages from January 2022. The substance was consistent with the manner in which Delaney had been dealing with sources in the past. It also directed his customers to go to Oak Street in order to obtain controlled substances from him.

**The Firearm Enhancement, U.S.S.G. § 2D1.1(b)(1) Is Property Applied**

The enhancement for the presence of the firearm pursuant to U.S.S.G. § 2K2.1(b)(6)(B), should apply. The government need not prove he committed armed drug trafficking, which would be a different offense altogether. At the time that the police entered Delaney's Oak Street residence, the located two digital scales, U.S. currency that included buy money, 9 mm ammunition, a firearm magazine, a blender with cocaine inside; and in a bedroom with the defendant's identification card, there was a loaded black rifle with a chambered round, pill bottles with unknown liquid inside, a meth pipe, a live

marijuana plant, and other items. There was additional drug paraphernalia located in other bedrooms and a kitchen.

When applying 2D1.1(b)(1), "courts mut consider the relationship between the offense of conviction and the other offense consistent with relevant conduct principles." *United States v. Clinton*, 825 F.3d 809, 811 (7th Cir. 2016). Courts have held that the proximity of a firearm to drugs *alone* can support the enhancement. *United States v. Morgan*, 800 Fed. Appx. 430 (7th Cir. 2020) (unpublished). When a firearm is found in close proximity to drugs or drug paraphernalia, "the conclusion that the firearm is connected to that drug activity is a reasonable one in light of the common use for that purpose." *Clinton*, 825 F.3d at 811 (*citing United States v. LaPage*, 477 F.3d 485, 489 (7th Cir. 2007)). The fact that the firearm was a long gun and not a pistol should have no bearing on the application of the enhancement, because it can be inferred that a loaded rifle in the home of a drug dealer provides the dealer with protection or "emboldens" his enterprise. *United States v. Lundquist*, 3:18-CR-64, ECF 94 at 5, *citing United States v. Sewell*, 780 F.3d 839, 848 (7th Cir. 2015) (citations omitted). This enhancement is appropriate.

**The Methamphetamine Guidelines Accurately Support a Base Level 32 Based on the Converted Drug Weight**

The guideline for the weight of the methamphetamine was calculated correctly according to the existing guideline manual. While the court may

9

vary based on policy disagreements with the drug guidelines, *United States v. Burns*, No. 3:20-cr-19, ECF 110 at 9, *citing Spears v. United States*, 555 U.S. 261, 265-66 (2009), *Kimbrough v. United States*, 552 U.S. 85, 107 (2007), *United States v. Corner*, 598 F.3d 411, 415 (7th Cir. 2010), this sentencing court has declined to do so in the past.

The Seventh Circuit, along with most other courts, adhere to the guidelines when determining methamphetamine weight. *United States v. Bostock*, 910 F.3d 348, 350-51 (7th Cir. 2018), *United States v. Turner*, 93 F.3d 276, 287 (7th Cir. 1996). As this court has explained, while the guideline range is not presumed reasonable, varying become some courts have disagreed with the methamphetamine weight calculations would create unwarranted sentencing disparities nationally and within the same courtroom. *Burns*, ECF 110 at 11. There are additional reasons that the present guideline distinction should be upheld. Namely, methamphetamine is a highly destructive drug and it one of the most abused stimulants in the world. *United states v. Farris*, 421 F. Supp. 321, 330 (D. Va. 2019). Research has demonstrated that meth abuse causes new waives of crime, unemployment, child abuse and neglect, and has a deleterious effect on entire communities. *Id.* (*citing* Nat'l Inst. On drug Abuse, *Methamphetamine Overview* (April 2009)). A guideline that recognizes a distinction between pure and diluted methamphetamine accounts for the increased popularity of

10

the drug, the "more profound effect on the user, and its connection with international crime syndicates." *Id*. Indeed, methamphetamine prosecutions, with the exception of pandemic ravaged 2020, have consistently raised from 6,400 in 2015 to 8,400 in 2021. https://ida.ussc.gov/analytics/saw.dll?Dashboard&PortalPath=%2Fshared%2FIDA%2F_portal%2FIDA%20Dashboards (last visited December 19, 2021).

In this case, the existing Guideline Manual calls for a distinction between pure methamphetamine and a more diluted mixture or substance containing methamphetamine. The U.S. probation department recognized this when determining drug weight. Because the weight, as calculated in the draft PSR is consistent with the guideline manual and there is no mathematical error in calculating the converted drug weight, the guideline range as set forth in the draft PSR is correct.

### History and Characteristics of the Defendant

At thirty-two years old, Mr. Delaney's pattern of criminal history has earned him a place in criminal history category VI. With seventeen criminal history points, he *far* exceeds the threshold of category VI—the highest category the sentencing table accounts for. At his relatively young age, Mr. Delaney is in a league of his own. He has accumulated more convictions that other defendants might accumulate in an entire lifetime.

Mr. Delaney charged out of the gates at just nineteen when he committed felony home invasion in Michigan. He received a relatively short prison sentence for this first offense being sentenced to 19 to 180 months. (PSR ¶ 41). Thereafter, Delaney committed four consecutive substance offenses including controlled substance use and possession, along with resisting police (PSR ¶¶43, 45, 47, 49). At twenty-three, he was convicted of another felony, this time for financial transaction device stealing. He was sentenced originally to sixty days in jail with 24 months of probation. He violated probation and his sentence was revoked. (PSR ¶ 51). Just before he was sentenced for this felony, Delaney committed yet another substance offense. (PSR ¶ 53).

In his mid-twenties, Delaney upped the ante and began directing violence towards women. First, in July 2015 he battered a significant other while her seven-month-old child was in the home. The incident resulted in the victim sustaining observable physical injuries. (PSR ¶¶ 55-56). He violated his probation in this battery case. Months after he committed this first battery, he committed another battery in the presence of a child in November 2015. (PSR ¶ 57). This time, the defendant "charged" the female victim and punched her in the head in front of her children. (PSR ¶ 58). For beating his former girlfriend, the defendant was sentenced to 18 months in jail.

Spending at least six months in jail for his acts of violence did nothing to dissuade Delaney. Instead, in June 2016 he committed felony delivering or

12

manufacturing less than fifty grams. As outlined in the PSR, police used a confidential source to buy 13.5 grams of marijuana from the defendant on three separate occasions and less than a half gram of crack cocaine. (PSR ¶ 60). Thereafter he committed another substance offense in October 2017. (PSR ¶ 61).

According to the testing administered by probation, and consistent with his criminal past, Delaney appears to have a documented substance abuse problem that should be addressed while he is incarcerated to reduce the risk of recidivism. Though he has attended drug treatment at least four times previously, perhaps the fifth time will be the charm. The defendant was diagnosed with depression and had a challenging childhood. He does not wish to attend counseling, however, because he thinks it is "nonsense." (PSR ¶ 99).

The government submits that based on Delaney's voluminous criminal history, probation violations, and personal characteristics, a downward variance would not be proper and that a sentence within the guidelines is reasonable. Mr. Delaney's criminal history category of VI is a function of his substantial criminal behavior and adequately accounts for his character.

**The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment for the Offense, and Afford Adequate Deterrence to Criminal Conduct**

With regard to the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the

offense, and to afford adequate deterrence to criminal conduct, a period of incarceration within the guidelines is appropriate. Delaney has a terrible criminal history. He delivered pure crystal methamphetamine to undercover sources on multiple occasions. A gun was present at the residence where he was living and dealing ice. Only a sentence within the guidelines can account for the severity of Mr. Delaney's conduct. He has thus far been undeterred by anything the criminal justice system has offered to assist him in his rehabilitation.

## Conclusion

It is the government's position that based upon Mr. Delaney's actions in this matter, the enhancements found to apply and his past history, the government recommends that the Court impose a sentence at the low end of the guidelines, followed by a suitable period of supervised release.


///

Dated:   January 3, 2023

>Respectfully submitted,
>
>CLIFFORD D. JOHNSON
>UNITED STATES ATTORNEY
>
>BY:   *s/ Kimberly Schultz*
>         Kimberly Schultz
>         Assistant United States Attorney
>         5400 Federal Plaza, Suite 1500
>         Hammond, Indiana  46320
>         Tel:   (219) 937-5500
>         Fax:   (219) 852-2770
>         E-mail:  Kimberly.Schultz@usdoj.gov